**SO ORDERED.**

**SIGNED this 22 day of April, 2021.**



_____
**Joseph N. Callaway
United States Bankruptcy Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## NEW BERN DIVISION

| | |
|---|---|
| IN RE:<br><br>**PLATINUM CORRAL, L.L.C.,**<br><br>Debtor. | **CASE NO. 21-00833-5-JNC<br>CHAPTER 11** |

### INTERIM ORDER GRANTING DEBTOR'S MOTION UNDER 11 U.S.C. §§ 105(a), 363(b) AND 1107(a) (A) AUTHORIZING DEBTOR TO MAKE PAYMENTS PURSUANT TO AND OTHERWISE PERFORM IN ACCORDANCE WITH THE CRITICAL VENDOR AGREEMENT WITH MCLANE FOODSERVICE DISTRIBUTION, INC., (B) GRANTING ADMINISTRATIVE EXPENSE PRIORITY STATUS; AND (C) GRANTING RELATED RELIEF

Upon consideration of the motion (the "*Motion*")[1] for entry of an order (this "*Interim Order*") filed by the above-captioned Debtor (Doc. 22); and the Court having found that it has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that consideration of the Motion and the relief requested therein is a core proceeding pursuant to 28 U.S.C. § 157(b); and the Court having found that venue of this proceeding in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that notice of the Motion as set forth therein is sufficient under the circumstances; and

---

[1] Capitalized terms not defined herein shall have the meanings given to them in the Critical Vendor Agreement (as hereinafter defined).

the Court having reviewed the Motion and having considered the record at the hearing held before this Court (the "***Hearing***"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor,

IT IS THEREFORE ORDERED THAT:

i. The Motion is GRANTED as set forth herein on an interim basis.

ii. The final hearing (the "***Final Hearing***") on the Motion shall be held on May 5, 2021, at 1:00 pm, prevailing Eastern Time via videoconference. You may join the Final Hearing by using the ZoomGov Meeting link below, with the Meeting ID and Passcode provided:

**ZoomGov Meeting:**
https://www.zoomgov.com/j/1604993000?pwd=TVhLRkFsVmN4RTNlNURWM0FpNHIyZz09

**Meeting ID: 160 499 3000**
**Passcode: 04613040**

iii. Any objections or responses to entry of a final order on the Motion shall be filed and served on or before 5:00 p.m., prevailing Eastern Time, on April 29, 2021.

iv. The Debtor is authorized to make payments on an interim basis to McLane pursuant to and otherwise perform in accordance with the Critical Vendor Agreement attached hereto as Exhibit A (the "***Critical Vendor Agreement***"), including continued performance under the Note, satisfaction of the Prepetition Admin Claim in the ordinary course of business, and interim approval of the Critical Vendor Agreement in all other respects, subject to the Court's determination at the Final Hearing. McLane is authorized to apply the Held Amounts to the Prepetition Admin Claim pursuant to section 503(b)(9) of the Bankruptcy Code and to apply the Note Payment to the Note. To the extent of any inconsistencies between the provisions of this

2

Interim Order and the provisions of the Critical Vendor Agreement or the Note, this Interim Order shall control.

v.  McLane shall be entitled to prompt payment in full in the ordinary course of business of the Prepetition Admin Claim to the extent of any Prepetition Admin Claim remaining unpaid after application of the Held Amounts.

vi.  Until the Final Hearing, McLane will extend to the Debtor net 7-day payment terms, subject to the provisions of the Critical Vendor Agreement.

vii.  All undisputed obligations of the Debtor arising from the post-petition delivery of goods or services subject to Outstanding Orders (as defined in the Motion) are afforded administrative expense priority status under § 503(b)(1) of the Bankruptcy Code and the Debtor is authorized to satisfy such obligations in the ordinary course of business.

viii.  On or before April 19, 2021, McLane shall provide the Debtor, the Bankruptcy Administrator, any committee that has been appointed on or before that date pursuant to § 1102 of the Bankruptcy Code, and Pacific Premier Bank (collectively, the "***Notice Parties***"), a schedule, sworn under penalty of perjury, of all payments received from the Debtor during the ninety days prior to the Petition Date and containing the following information for each payment: (a) the related invoice number, amount, delivery date, and invoice due date; and (b) the date the payment was received by McLane (the "***Payment History***").  Within thirty days of the Petition Date, McLane will provide the Payment History to any other party in interest that so requests. Upon timely written request, McLane will provide the documents that support the information in the Payment History within a reasonable time.

x. Notwithstanding Section 4(c) of the Note, McLane shall not be entitled to exercise the remedies under Section 5 of the Note based exclusively upon the pendency of Debtor's above-captioned bankruptcy case; provided, however, that McLane shall be entitled to exercise any and all remedies available to it at law or in equity should Debtor default under the Note pursuant to another subsection of Section 4 during the pendency of Debtor's above-captioned bankruptcy case.

xi. Notwithstanding the possible applicability of Bankruptcy Rule 6004(h), this Interim Order shall be immediately effective and enforceable upon its entry.

xii. The Debtor is authorized to take all actions necessary to effectuate the relief granted pursuant to this Interim Order.

xiii. The Court hereby retains jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Interim Order.

[End of Document]

5

**EXHIBIT A**

**Critical Vendor Agreement**

5

## **CRITICAL VENDOR AGREEMENT**

This CRITICAL VENDOR AGREEMENT (this "**Agreement**") is entered into this 12th day of April, 2021, between, on the one hand, PLATINUM CORRAL, L.L.C., a North Carolina limited liability company ("**Platinum Corral**" or "**Debtor**"), and, on the other hand, MCLANE FOODSERVICE DISTRIBUTION, INC., a North Carolina corporation, f/k/a Meadowbrook Meat Company, Inc. ("**McLane**").

## **RECITALS**

A. Platinum Corral is headquartered in Jacksonville, North Carolina, and it operates approximately twenty-eight (28) Golden Corral restaurants located in North Carolina, Virginia, West Virginia, Kentucky, Ohio, and South Carolina (the "**Restaurants**"), some of which have been closed as a direct consequence of the novel 2019 coronavirus disease caused by severe respiratory syndrome (SARS-CoV-2) that has created a global pandemic (the "**COVID-19 Pandemic**");

B. Debtor is a counterparty to one or more franchise agreements (the "**Franchise Agreements**") with Golden Corral Franchising Systems, Inc. or its affiliates (the "**Franchisor**"), and as Golden Corral franchisees, Debtor is required to comply with certain recipe and ingredient specifications dictated by the Franchisor;

C. McLane is and has been the primary Franchisor-required supplier to the Restaurants, and thus, McLane purchases, warehouses, and distributes a substantial portion of all the food items and related restaurant items, including, among other things, meat products, produce, paper products, cleaning supplies and required recipe ingredients (the "**Goods**") required to operate the Restaurants in compliance with the Franchise Agreements;

D. Debtor's primary source of revenue comes from Restaurant sales, specifically, the sale of the Goods that McLane delivers, and thus, the Debtor is highly dependent on uninterrupted supply from McLane to derive revenue; indeed, as the sole-source supplier to the Restaurants, McLane is uniquely equipped to distribute the fresh ingredients required in the Debtor's business, and the Debtor's business would be materially harmed (both financially and operationally) if McLane refused to ship the Goods to the Restaurants;

E. McLane is not required to deliver any Goods to any of the Debtor's Restaurants on credit by virtue of an executory contract; rather, the award of any credit terms is determined by McLane in McLane's sole discretion, and McLane may freely revoke any award of credit terms at any time by forcing payment by wire in advance of delivery of Goods, which would negatively and severely affect Debtor's liquidity and operations, including its ability to continue as a going concern while a debtor in possession;

F. On April 9, 2021 (the "**Petition Date**"), Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Eastern District of North Carolina (the "**Court**") and, if required, has sought or will seek authority from its secured creditors for the use of cash collateral that will permit it to comply with the terms of this Agreement;

G.	As of the Petition Date, the Debtor owed McLane approximately $367,888.13 in prepetition debt that relates to deliveries made prior to the Petition Date (the "**Prepetition Amount**").  A portion of the Prepetition Amount relates to goods delivered to the Restaurants shortly after the Covid-19 Pandemic began ($166,399.64) (the "**COVID-19 Balance**"), net of certain prepetition payments made pursuant to 11 U.S.C. § 547(j) and according to the Note (as hereinafter defined);

H.	The balance of the Prepetition Amount owed to McLane, namely the $201,488.49 difference between $367,888.13 and $166,399.64, falls within the 20-day window under section 503(b)(9) of the Bankruptcy Code (the "**Prepetition Admin Claim**"), and because the Prepetition Admin Claim is allowable as an administrative claim under section 503(b)(9) of the Bankruptcy Code against Debtor's estate, Debtor is required, at the very latest, to pay the Prepetition Admin Claim upon the effective date of any plan of reorganization in accordance with 11 U.S.C. § 1129(a)(9);

I.	On the first business day after McLane became aware of Debtor's Petition Date, Monday, April 12, 2021, McLane attempted to discontinue all automatic drafting of Debtor's account in compliance with section 362(a) of the Bankruptcy Code. However, two automatic draft payments, one for $72,132.43 and another for $97,932.11 (the "**Held Amounts**"), cleared into McLane's account before they could be cancelled. Because those payments would have applied on account of a prepetition debt, McLane is holding but has not applied those amounts, pending determination by the Court of *Debtor's Motion Under 11 U.S.C. §§ 105(a), 363(b), 364(a) and 1107(a) (A) Authorizing Debtor to Enter Into A Critical Vendor Agreement with McLane Foodservice Distribution, Inc., (B) Granting Administrative Expense Priority Status; and (C) Granting Related Relief* [D.E. 22] (the "**Motion**"). Should the Court grant the Motion, enter the Critical Vendor Order (as hereinafter defined), and authorize this Agreement, including authorization to apply the Held Amounts to the Prepetition Admin Claim, that would reduce the Prepetition Admin Claim to $31,423.95 and would reduce the Prepetition Amount to $197,823.59;

J.	Likewise, on April 15, 2021, Debtor made a postpetition payment toward the COVID-19 Balance of $5,000 pursuant to the Note (as hereinafter defined) (the payment, the "**Note Payment**"). Because the Note Payment would have applied on account of a prepetition debt, McLane is holding but has not applied this amount, pending determination of the Motion. Should the Court grant the Motion, enter the Critical Vendor Order (as hereinafter defined), and authorize this Agreement, including authorization to apply the Note Payment toward the COVID-19 Balance, that would reduce the COVID-19 Balance to $161,399.64 and would further reduce the Prepetition Amount to $192,823.59;

K.	McLane also holds claims against Debtor (the "**PACA Claim**") under the Perishable Agricultural Commodities Act, 7 U.S.C. § 499, *et seq.*, as amended ("**PACA**"), which allows the imposition of a trust over Goods subject to PACA and over the proceeds received by Debtor for such Goods;

L.	McLane and Debtor are also party to a certain Purchase Money Security Agreement, effective as of March 16, 2009 (the "**PMSA**"), whereby to secure the prompt and complete payment, observance and performance when due of all of Debtor's obligations, Debtor assigned and pledged a security interest in all inventory of the Debtor purchased from McLane and

any cash proceeds therefrom ("**Cash Collateral**"), as more particularly set forth in the PMSA. The security interest granted by the PMSA has been continuously and properly perfected according to the Uniform Commercial Code by the filing of UCC-1 financing statements from the effective date of the PMSA;

M. Due to severe liquidity and logistical issues that could be caused by the conversion of the Debtor's credit terms from net-7 day terms to bank wire in advance of loading trucks at McLane's various distribution centers and McLane's right to suspend deliveries to the Debtor, the Debtor has requested that McLane continue to award it net 7-day terms after the Petition Date, subject to the terms and conditions of this Agreement;

N. To encourage McLane to continue to provide the Goods to the Debtor on net-7 day credit terms during the term of this Agreement, Debtor has reached this Agreement with McLane, which, if approved by this Court, will govern the treatment of McLane's prepetition claims and the Debtor's and McLane's postpetition relationship through and including the effective date of any plan of reorganization or sale(s) of substantially all the assets of the Debtor's assets under section 363 of the Bankruptcy Code;

O. Further, given the material consideration being extended by McLane in this Agreement, including the provision of significant postpetition credit that will allow Debtor to operate as a going concern and reopen certain closed stores, it is Debtor's reasonable business judgment that such facts warrant the accommodation of a waiver and release of all claims Debtor may or may not have under Sections 502, 510, 542, 543, 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code (collectively, and along with other similar or related state or federal statutes or common law, the "**Chapter 5 Claims**") against McLane, subject to an appropriate review and objection period by other parties in interest; and

P. McLane and the Debtor have engaged in good faith, arms' length negotiations regarding this Agreement.

**NOW THEREFORE**, in consideration of the premises and mutual covenants contained herein and other valuable consideration, the receipt of which is hereby acknowledged, it is stipulated, acknowledged, and agreed between the Debtor and McLane, as follows:

2.
**(PREPETITION DEBT AND SECURITY THEREFORE)**

a. <u>Prepetition Admin Claim</u>. Following the entry of a Critical Vendor Order (as hereinafter defined), McLane shall apply the Held Amounts to the Prepetition Admin Claim and Debtor shall promptly pay the remaining balance of the Prepetition Admin Claim as it becomes due in the ordinary course of business (i.e., according to net-7 day credit terms).

b. <u>Promissory Note for Remaining Prepetition Amount</u>. Debtor executed a promissory note effective March 31, 2021 in the amount of $191,891.26 (the "**Note**" and the amount, the "**Note Amount**"), which, as of March 31, 2021, was the outstanding amount of the COVID-19 Balance. Pursuant to the Note, Debtor promised to pay $5,000 per week, subject to the terms of the Note, until the remainder of the COVID-19 Balance is paid in full, it being understood that the Note is

fully secured by the PMSA. To the extent necessary, Debtor shall provide for this treatment pursuant to a plan of reorganization.

      c.      <u>Payments</u>. The Note is dated March 31, 2021. Since that date, the Debtor made prepetition payments to McLane in the amount of $25,491.629 on the Note Amount (the "**Prepetition Payments**"). The Prepetition Payments are comprised of a weekly payment of $5,000 on April 2, 2021, a weekly payment of $5,000 on April 7, 2021 (each, a "**Weekly Payment**"), and a payment of $15,491.62 on April 7, 2021. The Weekly Payments were made pursuant to the terms of the Note. The $15,491.63 payment was made in order to satisfy a portion of the Note Amount related to the Debtor's restaurant located in Chillicothe, OH (Store 722) which is closed. The Debtor, with the consent of Franchisor, assigned its franchise agreement related to Store 722 to a third-party franchisee. As a condition to providing supplies to the third-party franchisee, McLane required that the Debtor satisfy that portion of the Prepetition Amount related to Store 722 in the amount of $15,491.63 (the "**Assignment Payment**"). Assignment of the Store 722 franchise agreement to a third-party franchisee relieved the Debtor of certain ongoing liabilities and obligations related to and arising under the franchise agreement.

3.
**(POSTPETITION CREDIT AND SECURITY THEREFORE)**

      a.      <u>Postpetition Credit</u>. Commencing on the Effective Date of this Agreement, McLane shall continue to ship Goods to the Debtor on net-7-day terms so long as the Debtor does not commit a default in payment and fail to cure such default as set forth in the next sentence. If the Debtor commits a default in payment (subject to a two business day cure period following written notice to Debtor and its counsel) to McLane of the Prepetition Amount or any outstanding postpetition invoice according to such invoice's terms, McLane shall have no obligation to ship Goods, and the net-7-day terms may be fully revoked in McLane's sole and absolute discretion, including by reducing the Debtor's terms to bank wire in advance of loading McLane's trucks at its various distribution centers; <u>provided</u>, <u>further</u>, that (A) if the Debtor defaults in payment to McLane more than twice during a six month period, the net-7-day terms may be fully revoked in McLane's sole discretion, regardless of any cure period or (B) if Debtor proposes any sale of all or substantially all of the Restaurants under sections 363 or 1123 of the Bankruptcy Code that does not provide for the payment in full of McLane's Prepetition Amount and postpetition credit, the net-7-day terms may be fully and immediately revoked in McLane's sole discretion.

      b.      <u>Cash Collateral</u>. To the extent required, Debtor shall obtain the consent of its other secured creditors or shall obtain an order of the Court with an appropriate budget permitting it to pay McLane timely consistent with the terms and conditions of this Agreement. Further, any cash collateral order approved by the Court must grant McLane a replacement lien in postpetition inventory and related proceeds consistent with the terms of the PMSA.

      c.      <u>McLane's Postpetition Claims</u>. Debtor stipulates and agrees that the postpetition amount arising from McLane's delivery of Goods postpetition is a valid and outstanding obligation of Debtor and shall be fully allowed as an administrative claim against its estate under section 503(b)(1) of the Bankruptcy Code equal to the postpetition amounts outstanding. Debtor stipulates that this Agreement and any prepetition agreement between Debtor and McLane is an agreement

to make a loan or financial accommodations to the Debtor within the meaning of section 365(c)(2) of the Bankruptcy Code.

        d.        <u>McLane's Reservation of Rights</u>. Except as otherwise expressly provided herein, this Agreement does not limit, modify, or otherwise affect McLane's rights and remedies that existed before the Petition Date with respect to the Debtor, including, without limitation, McLane's right to revoke credit terms if Debtor fails to make timely payment of the Prepetition Amount as set forth herein and pursuant to the Note or timely payment of any postpetition invoice according to such invoice's terms. Specifically, in accordance with McLane's prepetition credit practices, the Debtor shall not be entitled to any early pay incentives, unless otherwise entitled to such incentives under McLane credit policies. Nor does this Agreement create any executory obligation on the part of McLane after the Debtor emerges from bankruptcy. Following the effective date of any plan of reorganization or any sale under section 363 of the Bankruptcy Code, McLane's agreement herein to provide net-7-days of postpetition credit shall automatically terminate, and the parties shall return to their ex ante position whereby McLane may determine to award credit terms in its sole and absolute discretion, which may or may not result in the Debtor receiving net-7-day credit terms. Further, nothing in this Agreement shall bind McLane to provide credit terms to any purchaser of the Debtor's assets in connection with a plan of reorganization or a sale under section 363 of the Bankruptcy Code or otherwise. McLane hereby reserves all of its rights to underwrite and review any such purchaser's credit pursuant to its internal credit standards and may, in its sole and absolute discretion, decide to reduce credit terms to less than net-7-days or deny credit terms altogether with respect to such purchaser.

        e.        <u>Chapter 5 Claims</u>. As a condition to McLane providing postpetition credit to the Debtor, the Critical Vendor Order shall provide that Debtor, for itself and on behalf of its predecessors, successors, and assigns, and its bankruptcy estate, including any trustee, plan administrator, liquidation agent, or similar person or entity, fully, forever, and completely releases and discharges, any and all Chapter 5 Claims against McLane and its subsidiaries, affiliates, officers, directors, agents, attorneys, representatives, predecessors, insurers, successors and assigns (the "**Chapter 5 Claim Release**"), subject only to an objection deadline, no longer than 60 days after the Petition Date, whereby parties in interest may file a written objection to such relief (the "**Objection Deadline**"). If any such objection is filed and the Court does not approve the Chapter 5 Claim Release on a final basis, McLane's obligation to extend credit pursuant to this Agreement shall terminate.

**4.**
**(MISCELLANEOUS)**

        a.        <u>Recitals</u>. Each of the recitals is material to this Agreement and each recital is hereby incorporated by reference as if fully set forth herein verbatim and made a part of this Agreement.

        b.        <u>Effective Date</u>. This Agreement is subject to and shall be effective only upon entry of an order, whether interim or final, by the Bankruptcy Court approving the Agreement (such order, the "**Critical Vendor Order**" and such date, the "**Effective Date**").

        c.        <u>Terms Not Severable</u>. The terms of this Agreement are not severable. If each term is not approved by the Bankruptcy Court, this Agreement shall be void and of no force and effect,

unless waived by McLane in writing, and McLane shall have no obligation to provide any credit to the Debtor or otherwise be bound by any term or condition of this Agreement.

      d.    <u>Further Assurances</u>. Debtor and McLane agree to execute and deliver, or to cause to be executed and delivered, all such instruments, and to take all such action as the other party may reasonably request in order to effectuate the intent and purposes of, and to carry out the terms of, this Agreement.

      e.    <u>Merger Clause</u>. This Agreement constitutes the full and entire agreement between the Debtor and McLane with regard to the subject hereof, and supersedes all prior negotiations, representations, statements on the record, promises or warranties (oral or otherwise) made by McLane with respect to the subject matter hereof.

      f.    <u>Governing Law</u>. This Agreement shall be considered to have been negotiated, executed, and delivered, and to be wholly performed, in the State of Texas, and the rights and obligations of the parties to this Agreement shall be construed and enforced in accordance with, and governed by, the internal, substantive laws of the State of Texas without giving effect to that state's choice of law principles.

      g.    <u>Jury Trial</u>. THE PARTIES TO THIS AGREEMENT EACH HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVE ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT OR ANY CLAIM, COUNTERCLAIM, OR OTHER ACTION ARISING IN CONNECTION HEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY EACH PARTY AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EACH PARTY IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY THE PARTIES.

      h.    <u>Amendments</u>. This Agreement may be amended or modified only by a written instrument signed by or on behalf of all parties.

      i.    <u>Counterparts</u>. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, and all such counterparts together shall constitute one and the same instrument. Facsimile or .pdf signatures shall be deemed originals with the same enforceability as if they were originals.

[Signature Pages on Next Page]

IN WITNESS WHEREOF, the Debtor and McLane have affixed their signatures hereto as of the date set forth in the preamble hereof.

PLATINUM CORRAL, L.L.C.

_____

By:
Its:

MCLANE FOODSERVICE DISTRIBUTION, INC.

_____

By:
Its:

[Signature Page to Critical Vendor Agreement]