**SO ORDERED.**

**SIGNED this 13 day of January, 2022.**



_____
**Joseph N. Callaway**
**United States Bankruptcy Judge**

---

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### NEW BERN DIVISION

IN RE:

**Platinum Corral, LLC,**                    **CASE NO. 21-00833-5-JNC**
                                              **CHAPTER 11**

      **DEBTOR**

## MEMORANDUM OPINION

After evidentiary hearings on these and related matters conducted November 10 and December 13, 2021, in its order of December 22, 2021 (Dkt. 446), the court denied confirmation of the Debtor's proposed chapter 11 Plan of Reorganization (Dkt. 289; the "Plan") filed September 16, 2021, amended December 10, 2021 (Dkts. 436 and 437; the "Amended Plan"), and sustained in part and denied in part the relevant Objection to Claims Number 35 and 36 (Dkt. 346; the "Claim Objection") filed October 18, 2021, by the Official Committee of Unsecured Creditors. Objections to the Plan filed in representative capacities by the Bankruptcy Administrator (Dkt. 372) and the Committee (Dkt. 377), and the claimant Mr. L. William Sewell, III's filed Response in Opposition

to the Claim Objection (Dkt. 389) were considered in the ruling.[1] The December 22 order was issued in the interest of time concerns and indicated this Memorandum Opinion would follow.

## BACKGROUND AND PROCEDURAL HISTORY

Platinum Corral, L.L.C. (the "Debtor") is a restaurant franchisee company headquartered in Jacksonville, North Carolina. It has two members, its CEO and President, L. William Sewell, III, who owns 87.5%, and John Pierce, who owns the remaining interest. Like many restaurants across the United States in 2020, the Debtor suffered unprecedented financial and operational challenges with the onset of pandemic conditions. Before the pandemic, the Debtor operated twenty-eight Golden Corral franchise restaurants located in North Carolina (11), Virginia (6), Ohio (4), West Virginia (3), Kentucky (3), and South Carolina (1). As a result of significant financial losses and restaurant closures, it now operates twelve restaurants.  The Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on April 9, 2021 (the "Petition Date"), and it continues to operate the surviving restaurants as a debtor-in-possession under a series of cash collateral and other operating orders.

On May 5, 2021, an order was entered appointing a committee of six unsecured creditors to participate and function in the case pursuant to 11 U.S.C. §§ 1102 (the "Committee") (Dkt. 131). The Committee employed counsel (Consent Order, Dkt. 242) who has been proactive in the case. On July 13, 2021, Mr. Sewell filed Proofs of Claim 35 and 36 asserting general unsecured claims in the amounts of $13,767,050 and $910,283 respectively (the "Sewell Claims"). In the Claim Objection, the Committee challenges the validity of the notes, accuracy of the amounts asserted as due, and treatment afforded the Sewell Claims in Class 12 of the Plan. As a remedy, the Committee

---

[1] Exhibits to the Response in Opposition to the Claims Objection shall be referred to herein by reference to the Exhibit Letter and the specific page referenced within Dkt 389; e.g., (Ex. A, Dkt. 389 at 17).

seeks to have all funds owed to Mr. Sewell recharacterized as equity in the Debtor rather than general unsecured debt.

The Plan (and Amended Plan) divides claims made against the Debtor into thirteen proposed classes:

> (1) Administrative claims; (2) priority claims; (3) unsecured priority tax claims; (4) secured claim of Pacific Premier Bank; (5) secured claim of Coastal Bank & Trust; (6) secured claim of LBC2 Trust; (7) secured claim of the US Small Business Administration; (8) the franchise agreements with Golden Corral Franchise Systems; (9) the claims of McLane Foodservice Distribution, Inc.; (10) secured claim of Ally Financial; (11) General Unsecured Claims; (12) the Subordinated Claims of Mr. Sewell; and (13) the Equity Interest Holders.

Class 11 is an impaired class consisting of allowed unsecured claims, excluding the unsecured portions of the claims of Golden Corral Franchise Systems (Class 8), McLane Foodservice (Class 9), and the Sewell Claims (Class 12), and the agreed deficiency portion of the claim of Pacific Premier Bank (Class 4), all of which are to be treated by consent within those respective classes. As a result, Class 11 primarily consists of unpaid trade debt and lease contract breach damages claims. Excluding those unsecured claims, the Debtor estimates that allowable surviving Class 11 trade debt claims will total between $5,000,000 to $10,000,000, with the Debtor's "best guess" placed at $6,500,000 for Plan consideration purposes. Under the Plan and Amended Plan, the Debtor proposes to pay Class 11 the sum of $20,000 per month for sixty months (a total of $1,200,000) into a disbursement account, from which quarterly pro rata distributions will be made on allowed claims.[2]

Class 12 as proposed is also an impaired class holding general unsecured claims, but only consisting of the insider Sewell Claims as represented by two promissory notes attached to Proofs

---

[2] Thus, if Class 11 allowed claims total the estimated amount, a dividend of 18.46% would result. The return would obviously change with the end allowed claim amount.

of Claim 35 and 36 in the respective payoff amounts as of the Petition Date of $13,767,050 and $910,283. Both notes are unsecured, and as such ordinarily would be included in or at least entitled to equal treatment with the unsecured trade debt reflected in Class 11.[3] However, rather than sharing pro rata with recovery for Class 11 constituents, under the pertinent provisions floated in the Plan (unchanged in the Amended Plan), the Sewell Claims instead will be deemed satisfied at confirmation by issuance of 100% of the equity interest in the newly reorganized Debtor. In addition, the Amended Plan proposes that Mr. Sewell provide a working capital infusion of $100,000 into the Debtor shortly after plan confirmation. Effectively, the $100,000 contribution and surrender of the two promissory notes are proposed as consideration for the receipt of all equity interest in the surviving entity to Mr. Sewell. The existing equity represented in Class 13 would be extinguished.

On November 1, 2021, in addition to standard objections regarding traditional feasibility, liquidation analysis, and bad faith, the Committee objected (Dkt. 377) to confirmation of the Plan. It asserts that the Plan as filed violates the absolute priority rule of §1129(b)(1)(B)(ii) of the Bankruptcy Code; lacks adequate new value; treats Class 11 unsecured creditors unfairly and inequitably; improperly discriminates between equal par Class 11 and 12 unsecured creditors; disguises capital contributions as debt in Class 12; and wrongly grants Pacific Premier Bank blanket secured claim status in Class 4. Regarding the absolute priority rule objection, the Committee maintains that the Plan fails to obtain a market test or otherwise prove the true, going-concern value of the company, and also fails to provide new "money or money's worth" in any amount because it merely proposes to trade existing capital (the Sewell Claims if recharacterized)

---

[3] If the Sewell Claims were allowed as valid unsecured claims for the amounts asserted and moved into Class 11, when combined with the estimated $6,500,000 allowed claim balance, approval of the Plan (as amended) with the same payment terms would result in a reduction of the Class 11 dividend to only 5.667%.

disguised as debt.[4]  The Bankruptcy Administrator joined the objection to confirmation (Dkt. 372) for the asserted violation of the absolute priority rule in the proposed Class 12 treatment. The Amended Plan attempts to answer the absolute priority rule objection by offering a new $100,000 capital infusion upon plan confirmation.

The ballot status at the hearings showed: Classes 1, 2, 5, 9, and 10 as given unimpaired treatment, resulting in deemed accepting classes; Class 7 as impaired but casting no ballot or plan objection; Classes 3, 4, 6,  8, 12, and 13 voting to accept the Plan (as amended); and Class 11 voting to reject its proposed treatment under the Plan (unaffected by the amendment) for the reasons set forth in its filed objection.  Counsel for the Committee appeared at the hearings and strenuously opposed confirmation.

## ISSUES

This opinion addresses the following issues:

(A) The Committee's objection to the Sewell Claims seeking to recharacterize prepetition debt as equity.

(B) The Committee's contention that the proposed division of Classes 11 and 12 results in an unfair discriminatory effect prohibited by the Bankruptcy Code.

(C) If the class divisions are allowed, whether the absolute priority rule applies to the Plan.

(D) If the absolute priority rule applies, whether exchanging the Sewell Claims plus a $100,000 capital contribution contribute sufficient inherent new value to constitute an exception to the absolute priority rule and whether a market test is required.

(E) Whether the Sewell debt conversion, given the payment dividend to Class 11 creditors and their lack of conversion rights, provides fair and equitable treatment for Class 11.

---

[4] Providing new adequate capital or other payment into the debtor to satisfy the absolute priority rule is widely known as the "new value exception," which is discussed at some length below.

## JURISDICTION

This court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157 and 1334, and the General Order of Reference entered August 3, 1984 by the United States District Court for the Eastern District of North Carolina. The matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), which this court has the jurisdiction to hear and determine. The court has constitutional authority to enter final judgment in this contested matter. *Wellness Int'l Network, Ltd., v Sharif*, 575 U.S. 665, 135 S. Ct. 1932, 1947 (2015).

## DISCUSSION

### A. Objections to Claims

The Committee alleges the promissory notes attached to Claims 35 and 36, both dated December 31, 2020, are an attempt to circumvent the priority scheme of the Bankruptcy Code by memorializing and classifying prior capital contributions made by owners as unsecured debt. The Committee contends the alleged improper classifications allow Mr. Sewell, as an insider and control person, to convert worthless capital to debt with some value, and thereby corral all of the new equity in the reorganized Debtor. (Dkt. 346, ¶¶ 1, 16.) Mr. Sewell conversely contends that at all times he and the Debtor intended for the cash advances to be treated as loans rather than capital contributions. (Dkt. 389 ¶¶ 23-25.) He further asserts that because a dividend will be paid to the Class 11 non-insider unsecured creditors, and his unsecured claim would dominate the class, by voluntarily surrendering that claim and forgoing a return, he is providing more than adequate "money's worth" to them and the Debtor, particularly when coupled with the $100,000 capital contribution from the Amended Plan.

At the first confirmation hearing on November 10, 2021, Mr. Sewell testified that in 2014, the Debtor had an approximate $6 million reduction in revenue compared to the previous year

without a corresponding reduction in expenses. (*See also* Dkt. 389, ¶ 18.) As a result, the Debtor faced a significant cash crunch and needed to obtain financing to meet operating expenses.  Mr. Sewell began making loans to the Debtor, and these loans were thereafter memorialized on the Debtor's consolidated financials for 2015-2020 on a year-end basis. (*Id.*)

Compounding the financial problems, in 2015, the Debtor discovered that its former chief financial officer (the "CFO") had failed to make necessary tax withholding and other payments in several states. (Dkt. 389, ¶ 19.)  After discovering the problem and terminating the CFO, Mr. Sewell loaned the Debtor another $5.8 million to cover the unpaid payroll, sales, and property taxes. Mr. Sewell testified that other members of Platinum Corral also made loans to the Debtor. (*See also* Dkt 389, ¶ 25.) The members were aware and approved of each other's loans.

The Debtor's balance sheet for the period ending December 28, 2016 indicated notes payable to shareholder in the amount of $9,186,664. (Ex. A, Dkt. 389 at 17.) In the years that followed, Mr. Sewell continued to make various loans to the Debtor, and the other members' notes and claims were satisfied over time. As noted, by the Petition Date, Mr. Pierce and Mr. Sewell were the only remaining members of the Debtor as of the Petition Date.

By the beginning of 2018, the Debtor and Mr. Sewell entered into a formal loan agreement to refinance the various loans made by Mr. Sewell to the Debtor between 2014 and 2017. (Ex B., Dkt 389 at 48.) This formal loan agreement resulted in the execution of the Promissory Note evidenced in Proof of Claim No. 35 ("Note 1"), dated December 31, 2017, in the original principal amount of $10,975,000 with interest at six percent (6.0%) per annum, uncollateralized, and payable on demand. (Ex. E, Dkt 389 at 65; Ex. W, Dkt. 390 at 14.) Both Mr. Sewell and Ms. O'Daniell testified that Note 1 was prepared by an attorney, Mr. Luther Starling, on behalf of the

Debtor, approved by other members, and the money represented in the original principal was actually placed into the Debtor's operating coffers.

At the end of each subsequent year, a renewal note was executed by the Debtor made payable to Mr. Sewell to reflect the year's end updated loan balance after deducting payments made during the previous year and adding in unpaid accrued interest. (Dkt. 389, ¶ 24.) These renewed notes were also prepared by outside counsel. (Dkt. 389, ¶ 25.) Upon execution of the renewal note, the previous year's note was replaced and marked as satisfied. (Dkt. 389, ¶ 24.) For example, Note 1 was initially renewed on December 31, 2018 with a new instrument for a loan balance of $12,252,625 on substantially the same terms as in prior years. (Ex. E, Dkt. 389 at 67; Ex. W, Dkt. 390 at 16.) A balance sheet schedule showing accumulated interest and additional loans made to the Debtor by Mr. Sewell, and crediting any payments received by him, throughout the year of 2018 was included in the exhibit. (Ex. E, Dkt. 389 at 69; Ex. W, Dkt. 390 at 18.) Note 1 was refinanced again on December 31, 2019, with a new note at the updated balance of $12,987,783. (Ex. E, Dkt. 389 at 70; Ex. W, Dkt. 390 at 19.) The ledger balance sheet was attached to show the transaction resulting in the new balance. Note 1 was last updated and replaced on December 31, 2020 with an updated loan balance of $13,767,050 as supported by the Debtor's regularly kept financial records, including the ledger and balance sheets reflecting each transaction.[5] (Ex. E, Dkt. 389 at 73; Ex. W, Dkt. 390 at 22.) Each year, an updated renewal note was executed, and the prior year's note marked satisfied.

On December 20, 2017, the Debtor refinanced its outside operating debt by entering a loan agreement with PPB for $16,200,000 in aggregate funding. (Ex. B, Dkt. 389 at 46.) At that time, the Debtor owed approximately $17,100,000 dollars to a consortium of outside lenders, but PPB

---

[5] The actual December 31, 2020, promissory note, the last "Note 1" executed, is the exhibit attached to Proof of Claim 35.

was only willing to loan the stated amount. To bridge the funding gap, the Debtor was forced to obtain $900,000 elsewhere. Because the PPB loan required a blanket lien on Debtor's assets, no third party would make a further loan. Mr. Sewell therefore was required to infuse the additional $900,000 into the Debtor himself. This new funding, evidenced by a second promissory note dated January 2, 2018 for $900,000 with interest at six percent (6%) per annum ("Note 2"), is the basis for Proof of Claim No. 36. (Ex. F, Dkt. 389 at 75; Ex. Y, Dkt. 390 at 2.)

As with Note 1, Note 2 was reset and memorialized at the end of every year in the form of a replacement note with an update to the loan balance accounting for both payments and accrued interest. On December 31, 2018, Note 2 was executed to reflect the updated loan balance of $847,646. (Ex. F, Dkt. 389 at 77; Ex. Y, Dkt. 390 at 4.) Note 2 was again refinanced in a new promissory note dated December 31, 2019 in the new loan balance of $864,466. (Ex. F, Dkt. 389 at 79; Ex. Y, Dkt. 390 at 6.) The ledger showing loans and payments made on Note 2 was attached to the proof of claim. (Ex. F, Dkt. 389 at 81; Ex. Y, Dkt. 390 at 8.) On December 31, 2020, Note 2 was refinanced for the final time pre-petition in the new loan amount of $910,283. (Ex. F, Dkt. 389 at 82; Ex. Y, Dkt. 390 at 9.)

In 2018, Elliot Davis, LLC, an independent auditor, examined the Debtor's financial records and accounting practices for the years ended January 3, 2018 and December 28, 2016. (Ex. B, Dkt. 389 at 34 - 49.) The auditor filed a report noting the various loans made by the majority shareholder (Mr. Sewell) and minority shareholders to the Debtor. (*Id*. at 48.) The report indicates that the loans between Mr. Sewell and the Debtor had a balance of $8,635,382 as of December 28, 2016. (Id.) This loan was refinanced on December 31, 2017 and became Note 1. (*Id.*) The report corroborates that the loan was refinanced in 2017 into a new note with the same terms and a balance

of $10,975,000 as of January 3, 2018. Further, the independent auditor's report does not indicate any concerns or improprieties relating to the loans between the Debtor and its shareholders.

The Debtor's Consolidated Financial Statements reflect the various loan balances owed to the shareholders beginning in 2015 and continuing to present. (Ex. A, Dkt. 389 at 10-33.) Ms. O'Daniell testified that she had a role in updating the financial statements to reflect the existence of the promissory notes in her capacity as Interim-CFO. The Balance Sheet for the period ending December 30, 2015 shows notes payable to shareholders in the amount of $3,404,282. (*Id*. at 13.) Subsequently, Mr. Sewell loaned the Debtor significant amounts of money. These loans were recorded on the Balance Sheets for the period ending December 28, 2016 which shows notes payable to shareholders in the amount of $9,186,664. (*Id*. at 17.) The next Balance Sheet for the years ending January 3, 2018, January 2, 2019, and January 1, 2020 show notes payable to shareholders of $12,426,282, $13,651,553, and $14,403,531 respectively. (*Id.* at 21, 25, and 29.) Finally, the Debtor's most recent Balance Sheet for the period ending December 30, 2020 shows notes payable to shareholders of $15,228,616. (*Id*. at 33.)

The Debtor's Note 1 General Ledger and Note 2 General Ledger reflect loans made from Mr. Sewell to the Debtor and payments back. (Ex. C and D, Dkt. 389 at 50 - 64; Ex. X and Z, Dkt. 390 at 24-31 and 11-18.) Ms. O'Daniell testified that the ledger was updated both when Mr. Sewell loaned money to the Debtor and when the Debtor paid money back on the notes.

### 1. Debt or Equity

A bankruptcy court is "not required to accept the label of 'debt' or equity' placed by the debtor upon a particular transaction but must inquire into the actual nature of a transaction to determine how best to characterize it." *In re Cold Harbor Assocs*., 204 B.R. 904, 915 (Bankr. E.D.Va. 1997). In making this determination, the following factors are considered:

> (1) The names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments.

*In re Dornier Aviation*, 453 F.3d 225, 233-34 (4th Cir. 2006); *quoting In re AutoStyle Plastics, Inc.*, 269 F.3d 726, 749-50 (6th Cir. 2001). However, in considering these factors, there is "[no] mechanistic scorecard," *Id.*, *quoting In re SubMicron Systems*, 432 F.3d 448, 456 (3d Cir. 2006), and "[n]one of these factors is dispositive and their significance may vary depending upon circumstances." *Id.*, *quoting Sender v. Bronze Group, Ltd. (In re Hedged-Invs. Assocs., Inc.)*, 380 F.3d 1292, 1297 (10th Cir. 2004).

Different factors require different weights depending on circumstances. Both Note 1 and Note 2 are labeled "Promissory Notes," which are instruments of indebtedness, and were drafted by an attorney at the request of the Debtor. While a label is not dispositive, it sheds light on the intent of the parties and is evidence that Mr. Sewell believed he was loaning money to the Debtor. *Cold Harbor Assocs.*, 204 B.R. at 916. Neither note has a fixed maturity date or schedule for regular payments. Interest accrues on both at six percent (6%) per annum, and both are payable on demand. Payments were made on the notes at various times and recorded in the Debtor's financial ledgers. While the lack of a fixed maturity date and fixed payment schedule weigh in favor of capital, the annual interest and demand payment weighs in favor of debt. *See AutoStyle Plastics*, 269 F.3d at 750 (concluding that that the use of demand notes along with a fixed rate of interest and interest payments is more indicative of debt than equity). These factors offset each other in the present instance.

Mr. Sewell began making the loans evidenced by Note 1 in 2014, several years before the Debtor refinanced its operating debt with the new $16.2 million loan from PPB in December 2017. During that time, the Debtor used other available sources of funding, as evidenced by claims filed by Coastal Bank & Trust, LBC2 Trust, and Ally Financial. Additionally, Mr. Sewell testified that the Debtor received financing from Bank United and First National Bank before the refinance. While Mr. Sewell testified at the confirmation hearing that there was an implicit understanding that his loans were to be treated as subordinate to those of Pacific Premier Bank, outside lenders were available. Credit availability from a non-insider lender strongly refutes any notion of inadequate capitalization at the time Mr. Sewell was making loans under Note 1. *See In re Franklin Equipment Co.*, 416 B.R. 483, 516 (Bankr. E.D.V.A. 2009).

Mr. Sewell and Ms. O'Daniell testified that advances from Note 1 were used by the Debtor for operational, rather than capital, purposes. "Use of advances to meet the daily operating needs of the corporation, rather than to purchase capital assets, is indicative of bona fide indebtedness." *Id.* at 518; *quoting AutoStyle Plastics*, 269 F.3d at 752. Specifically, Mr. Sewell began making the first loans in 2014 and 2015 to deal with a cash crunch caused by poor revenues in 2014. In 2016, Mr. Sewell loaned the Debtor $5.8 million to cover the unpaid payroll, sales, and property taxes. Use of funds to meet operational needs rather than to acquire capital assets weighs in favor of a finding of bona fide debt.

### 2. Note 1 Remains Characterized as Debt

Recharacterization of debt is "a highly fact-dependent inquiry that will vary in application from case to case." *Dornier Aviation.*, 453 F.3d at 234 (4th Cir. 2006). A court reviewing this question must determine and analyze the specific circumstances surrounding the origination and treatment of the challenged claim. *See Cold Harbor Assocs.*, 204 B.R. at 915.  While some factors

may weigh in favor of characterizing Note 1 as equity, after fully considering the Dornier factors and the circumstances of the loans, Note 1 is more properly characterized as Debt in the amount of $13,767,050.

Note 1 consists of loans made over the span of several years from Mr. Sewell to the Debtor. The advances were intended by both parties as loans on a revolver basis with the expectation of repayment with interest at 6% accumulating. The advances were actually made by Mr. Sewell and were properly and substantially contemporaneously memorialized in a formal "Promissory Note" prepared by the company's attorney. Note 1 does not contain a fixed maturity date or regular schedule of payments, but that only indicates it is a "demand note" in nature. Consistently, the principal balance became due and was adjusted at the end of each year to reflect payments made, interest accrued, and new cash advances made. A replacement note was then executed. Such terms and treatment are not unusual for roll-over operating loans from banks and other third-party lenders and are deemed appropriate here.

Although Note 1 and Note 2 were executed to Mr. Sewell, the Debtor's majority holder member—indeed the "control person" in all respects—he did so in a proper company capacity and with the knowledge and consent of the other members. Other members also made similar loans to the Debtor during this time as reported in Elliot Davis, LLC's independent audit report. Both Sewell Notes were properly memorialized in the Debtor's financial statements, and each had its own general ledger to track payments on the loan and any additional cash advances.

Outside of the Committee's rather conclusory allegations, virtually nothing indicates Note 1 would not be legally enforceable as a matter of law in a state court collection action. After considering the totality of the circumstances and weighing the factors as applied to the unique facts

of this case, Note 1 is properly characterized as debt. To rule otherwise here would result in virtually no insider advances ever being loans instead of capital.

### 3. Note 2 Recharacterized as Capital

Unlike Note 1, given the circumstances of and intent surrounding its origination, Note 2 must be recharacterized as a capital contribution. The purpose of the $900,000 loan evidenced by Note 2 was to enable the Debtor to obtain a loan from PPB. The Debtor had approximately $17.1 million in liabilities to satisfy so that PPB could receive a senior, first blanket lien on all of the Debtor's assets to secure $16.2 million in new financing. The funds advanced under Note 2, unlike Note 1, were not used to operate the Debtor. Instead, they were consumed in satisfying previous loans to third parties to provide clean first liens for PPB. The use of funds to pay off a loan secured by the Debtor's assets is a capital contribution. *Cold Harbor Assocs.,* 204. B.R. at 918. In effect, the $900,000 advance in Note 2 was used to increase the Debtor's capital ratio and meet PPB's leverage ratio requirements.  As Mr. Sewell admitted in his testimony before this court, PPB would loan no higher amount, and without the $900,000 cash infusion the PPB loan would not close. As such, the money advanced in Note 2 differs significantly from that in Note 1 in its circumstances, scope, and purpose at time of origination.

Under the *Dornier Aviation* factors analysis, it falls into the treatment as capital bin. The funds represented by Note 2 will therefore be recharacterized and deemed equity in the Debtor instead of unsecured debt for Plan and Amended Plan analysis purposes.

### B. Division of Unsecured Claims into Separate Classes

Having established that Mr. Sewell holds a valid unsecured claim in the reduced amount of approximately $13.7 million, the proposed treatment as a separate unsecured creditor class under the Plan and Amended Plan must be analyzed next. In general, claims of equal priority (such

as the general unsecured claims constituting Classes 11 and 12 here) are treated at equal par—that is, with the same terms, schedule of payments, contingencies and return percentage.  As noted above, the Plan (unaltered by the Amended Plan on this point) proposes to pay an estimated fifteen to twenty percent dividend on debt to Class 11, but gives no return for Class 12 debt and instead trades it for new equity in the reorganized debtor.

Under 11 U.S.C.  § 1122(a), claims "substantially similar to the other claims or interest" in that class "may" be placed and treated together in a chapter 11 plan of reorganization. Pointedly, the subsection does not prohibit division of similar claims. Instead, the court must look to other sections of chapter 11 to determine if a division of similar claims into two or more classes is proper and allowable in a chapter 11 plan. For example, if the treatment is for the purpose of "gerrymandering" an impaired accepting class or if the resulting treatment of the objecting class is not "fair and equitable" (section 1129(b)(2)(B)) or "unfairly discriminates" against one of the two equal priority classes, the split would not be justified or allowable. *See In re Bryson Properties, XVIII,* 961 F.2d 496, 502 (4th Cir. 1992); *In re Deep River Warehouse,* No. 04-52749, 2005 WL 2319201, at *4 (Bankr. M.D.N.C. Sept. 22, 2005); *In Re Sea Trail Corp.*, No. 11-07370-8-SWH, 2012 WL 5247175, at *8 (Bankr. E.D.N.C. Oct. 23, 2012).

Reaching that determination requires an analysis under a four-prong test. *Sea Trail*, 2012 WL 5247175, at *7; *In re Sutton*, No. 10-10539-8-RDD, 2012 Bankr. LEXIS 752, at *6-7, 2012 WL 433480, at *2 (Bankr. E.D.N.C. 2012). The factors to be considered are whether: (1) a reasonable basis for the proposed discrimination is presented; (2) the plan can be confirmed and consummated without the discrimination; (3) the plan discrimination is proposed in good faith; and (4) the discriminatory treatment results in a material prejudicial result to the class discriminated against. *Sea Trail*, 2012 WL 5247175, at *8; *quoting In re Jim Beck, Inc.*, 214 B.R.

305, 307 (W.D. Va. 1997). When applying this test, a court must weigh the four factors by looking at all of the facts and circumstances of each individual case. Separate classification "is permissible if the debtor can offer any reason 'which will withstand scrutiny….'" *Deep River Warehouse,* 2005 WL 2319201, at*5. "Although the proponent of a plan of reorganization has considerable discretion to classify claims and interests according to the facts and circumstances of the case, this discretion is not unlimited.... The potential for abuse would be significant otherwise....  If the…classifications are designed to manipulate class voting, … the plan cannot be confirmed." *Id.*; *quoting Bryson Properties,* 961 F. 2d at 502.

    In this case, from the evidence presented by the Debtor, the court finds that manipulation of class voting is not the primary purpose behind the split of the Sewell Claims from other general unsecured claims. Class 11 consists of trade and contract breach debt incurred in the ordinary operations of the Debtor's business in late 2019 or early 2020 as a result of operations or postpetition rejection of leases; payment of trade debt or lease payments as they came due in a prompt fashion was expected by these creditors. They are not in the business of running restaurants in general, much less in the heightened risk of the pandemic era. The surviving Class 12 debt from Note 1, on the other hand, is a form of owner financiering and long-term insider debt years in the making.  Periodic payments were made on it only when the trade and lease debts were paid first. The Committee recognizes this distinction in its Claim Objection seeking full Class 12 recharacterization into equity.  In addition, the Note 1 payoff exceeds the remaining expected Class 11 total by a factor of at least two.  If submitted within Class 11, the Note 1 Sewell Claim would receive about two dollars for every one received by the other projected allowed unsecured

creditors. Under the Plan, a projected $1.2 million return to non-insider Class 11 claimants would shrink to a mere $400,000.[6]

Further, under the Plan as amended and proposed, Class 11 trade and lease claimants ultimately are not eligible to trade debt for an equity interest in the reorganized debtor. The franchisor, Golden Corral, Inc., holds a veto over who may be a member of a franchisee company, and at the hearings on this matter made it clear that general creditors would not be approved as new limited liability company members. Further, there is no indication that any non-insider claimant has any interest in becoming an equity holder, particularly because further cash advance infusions will likely be required to keep the Debtor afloat in a post-confirmation environment or to pay projected administrative claims in Class 1 to trigger an effective date and emergence from chapter 11 for the Debtor. Finally, the Class 12 claimant is not concerned or motivated by a return in dollars to unsecured claims but instead with the protection of new equity. Whether he should be provided with that opportunity is not a question of class division, but what return to Class 11 is necessary to get there under applicable provision of the Bankruptcy Code.

Determination of class division for proper purposes is within the broad discretion and inherent purview of a bankruptcy court considering a plan of reorganization.  Here, the court finds ample business plan reasons to divide non-insider trade debt and insider note debt. Further, the unsecured claim division is made in good faith, at least as to Note 1. However, approval of a separate class for insider and control person debt as a general concept does not equate to and

---

[6] It should also be noted that the Committee does not object to the treatment of unsecured claims of Class 8 (Golden Corral) and Class 9 (McLane Foodservice) within those Classes. If Class 8, Class 9 and Class 4 (the PPB expected deficiency, which the Committee has objected to) were added to the unsecured claims, those claims would exceed about $42 million before considering the amount of allowable trade claims. Thus, an all-encompassing unsecured class would yield an estimated $50 million in claims. Even in the best liquidation scenario (sale of the business as a going concern), it is inconceivable that Class 11 would receive more than eighteen to twenty cents on the dollar. The best estimate would be around five cents on the claim dollar.

determine confirmation of the Plan and Amended Plan.  It merely takes confirmation into the next set of resultant issues.

### C.  The Absolute Priority Rule

To confirm a plan of reorganization under chapter 11 of the Bankruptcy Code, a proposed plan of reorganization must satisfy all the requirements of § 1129(a) of the Bankruptcy Code or fulfill the alternative provisions of § 1129(b), if triggered. Under Section 1129(a)(8), a plan may be approved only if "with respect to each class of claims or interests—such class has accepted the plan or is not impaired under the plan." Class 11, which consists of general unsecured claims and is represented by the Committee, overwhelmingly voted to reject the Plan (carrying over to the Amended Plan), thereby blocking confirmation on a consent basis under section 1129(a). However, a chapter 11 reorganization plan may still be confirmed over the dissent of an impaired class of creditors using the procedures found in § 1129(b), commonly known as "cram-down." *In re Maharaj*, 681 F.3d 558, 562 (4th Cir. 2012).

As the plan proponent, the Debtor bears "the burden of establishing by a preponderance of the evidence that the plan complies with the statutory requirements for confirmation of Section 1129(a)." *In re Swartville, LLC*, No. 11-08678-8-SWH, 2012 Bankr. LEXIS 3809, at *14 (Bankr. E.D.N.C. 2012); *quoting In re Atrium High Point Ltd. P'ship*, 189 B.R. 599, 609 (Bankr. M.D.N.C. 1995). To be confirmed over the rejection of an impaired class, the proponent of a chapter 11 plan bears the burden of showing by a preponderance of the evidence that all requirements of § 1129(b)(1) are met. *Sea Trail*, 2012 WL 5247175, at *9. Section 1129(b) requires that a plan "not discriminate unfairly *and* be "fair and equitable" with respect to each rejecting impaired class. *In re Grandfather Mountain Ltd. Partnership*, 207 B.R. 475, 486 (Bankr. M.D.N.C. 1996); *Sea Trail*, 2012 WL 5247175, at *9.  The bankruptcy court must analyze the two aspects of cram down

18

separately, beginning with the unfair discrimination between separate classes offered in § 1122; then, even if the class discrimination is warranted and not deemed unfair, a further review of the "fair and equitable" effect of the disparate treatment follows.

With respect to "a dissenting class of impaired unsecured creditors . . . a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, § 1129(b)(2)B)(i), or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property,' § 1129(b)(2)(B)(ii)." *Bank of Am. Nat'l Tr. and Sav. Ass'n v. 203 North LaSalle St. P'ship*, 526 U.S. 434, 441- 42 (1999). This condition is the core of what is commonly known as the absolute priority rule. "The absolute priority rule provides that 'a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property [under a reorganization] plan.'" *Bryson Properties*, 961 F.2d at 506; *quoting Northwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202 (1988). The rule exists because of the inherent tension created by allowing a debtor to propose its own plan of reorganization, as is demonstrated in this case, due to the danger that any reorganization plan proposed by a debtor will turn out to be simply too good a deal for its insiders and owners. *LaSalle*, 526 U.S. at 444.

Relying on its interpretation of *Sea Trail*, Debtor argues that because Mr. Sewell's claims are equal and not junior to Class 11 claims, the absolute priority rule is not triggered. *Sea Trail*, 2012 WL 5247175, at *11.[7] However, the Plan currently retains Note 2, which has been re-characterized as equity, in Class 12. Consequently, the attempted Sea Trail distinction no longer

---

[7] Additionally, in *Sea Trail*, shareholders holding allowed unsecured claims arising from shareholder loans received a tract of land and other assets, but not all of the equity in a reorganized debtor that could generate significant future profits. *See Sea Trail*, 2012 WL 5247175, at *2-3. Therefore, the present case is also distinguishable from *Sea Trail* because here, the Debtor's equity holder will receive new equity in a reorganized debtor rather than other property of some value.

fits because the $900,000 re-characterized equity interest of Note 2 taints the fully unsecured debt status of Class 12.

Even if a subsequent proposed plan removes Note 2 from Class 12, the fact remains that Mr. Sewell, as the sole control person of the Debtor, can dictate whatever plan the Debtor files next. As a result, any replacement plan is subject to careful scrutiny once again as to the actual respective value to Class 11 and surviving Class 12 entailed from disparate treatment. "Because 'no one else could propose an alternative' plan, 'the Debtor's partners necessarily enjoyed an exclusive opportunity that was in no economic sense distinguishable from the advantage of the exclusively entitled offeror or option holder.'" *LaSalle*, 526 U.S. at 455.

The Plan, and presumably the next one to be filed by the Debtor, calls for Mr. Sewell to trade Note 1 for the new equity interest. However, issuance or retention of an equity interest in an enterprise is a receipt of property. *Ahlers*, 485 U.S. at 208. This projected interest to be issued at confirmation is no different from a stock option for a 100% ownership in a company—which based on the projections submitted at the hearings is a potentially valuable property right (forecast at $2.8 million) if the Debtor returns to pre-pandemic profitability levels over the next five years.

The Plan does not offer any other creditor the chance to exchange debt for equity in a reorganized debtor. If a plan results in a likely superior return on insider debt, while Class 11 continues to vote against its treatment, and Class 12 appears reasonably destined for a materially higher return on debt, those creditors must be afforded that opportunity, or receive other just compensation. Under the unique facts of this case as a franchised restaurant operation, perhaps no plan can allow unsecured creditors to trade debt for equity given the franchisor's stated avow to oppose, but participation in future profits in chapter 11 plans are not limited to shareholders. Other proposals can be made. Further, the right to receive the new equity in the reorganized debtor may,

or may not, be more valuable than the promise to pay unsecured creditors a percentage return on debt over five years, but given the overwhelming vote against the Plan, the current proposal at just over 4% a year for five years does not appear to appease that analysis.

The Debtor and Mr. Sewell have presented no evidence to show that the value of the new Sewell equity interest does not exceed the Class 11 return or provide acceptable alternative treatment. Based on the record currently before the court, the absolute priority rule is in effect, and its requirements are not met in the Plan and Amended Plan.

### D. New Value Exception

The requirement of full payment of senior classes under the absolute priority rule has long been tempered by its so-called "new value exception." The new value exception pre-dates the 1978 passage of the modern Bankruptcy Code, and was classically formulated in *Case v. Los Angeles Lumber Products Co*:

> It is, of course, clear that there are circumstances under which stockholders may participate in a plan of reorganization of an insolvent debtor…. Where th[e] necessity [for new capital] exists and the old stockholders make a fresh contribution and receive in return a participation reasonably equivalent to their contribution, no objection can be made….

*Case v. Los Angeles Lumber Products Co*, 308 U.S. 106,121-22 (1932).

Although not explicitly described in the Bankruptcy Code, the submission of sufficient new value, under fair and equitable circumstances, avoids a fatal violation of § 1129(b)(2)(B)(ii) because it does "not give old equity property 'on account of' prior interests, but instead will allow the former owners to participate in the reorganized debtor on account of a *substantial, necessary, and fair new value contribution*." *In re RTJJ, Inc.*, No. 11-32050, 2013 WL 462003, at *12 (Bankr. W.D.N.C. February 6, 2013); *quoting In re Bonner Mall P'ship*, 2 F.3d 899, 909 (9th Cir. 1993) (emphasis added); *see also* 7 *Collier on Bankruptcy* ¶ 1129.03(4)(c) (Richard Levin & Henry J.

Sommer eds., 16th ed., 2021). "[A] plan that allowed stockholders in the business that had filed for bankruptcy protection (old equity) to receive stock in the reorganized debtor in exchange for contributions of added capital (new value) could under certain conditions satisfy the absolute priority rule and be considered 'fair and equitable' even though a senior class was not paid in full." *Bonner Mall*, 2 F.3d at 906 (9th Cir. 1993).

### 1. Sufficiency of New Value

To be sufficient, proposed new value must be: (1) new; (2) substantial; (3) in money or money's worth, (4) necessary for the debtor's successful reorganization, and (5) reasonably equivalent to the value or interest received or retained as a result of the contribution. *In re Bumgardner*, No. 10-09785-8-SWH, 2013 Bankr. LEXIS 747, at *24 (Bankr. E.D.N.C Feb. 28, 2013); *citing*, *Bonner Mall*, 2 F.3d at 909, *In re RTJJ, Inc.,* 2013 WL 462003, at *12, *In re Eagan*, No. 12-30525, 2013 Bankr. LEXIS 260 (Bankr. W.D.N.C. Jan. 22, 2013); *Grandfather Mountain Ltd. Partnership*, 207 B.R. at 492.

The Debtor argues that if the Plan does trigger the absolute priority rule, the Amended Plan satisfies it by providing for a $100,00 cash contribution by Mr. Sewell directly into the reorganized Debtor upon plan confirmation, such payment being in addition to the marked satisfaction of the Sewell Claims in Class 12. The Committee responds that the stated contribution is insufficient in amount; does not begin to meet the postpetition additional capital needs of the Debtor; and is outside of consideration as absolute priority rule satisfaction since the contribution does not affect or increase the return to Class 11 claims.

To support its argument that the debt surrender and cash infusion constitute sufficient new value to make the proposed treatment of the general unsecured class "fair and equitable" under the circumstances, the Debtor places great reliance on the statement of its financial expert, Mr. Brett

Bishov. At his deposition for trial, when asked about the value of the equity in the reorganized debtor, Mr. Bishov stated, "You would have to pay me to take it. Less than zero. Zero or less than zero. There is no value in the equity." (Ex. EE, Dkt. 438 at 105.) The Debtor says that since $100,000 is more than zero, the new value exception is satisfied.

It is of course true that the cash contribution is more than nothing; however, Mr. Bishov's statement does not establish that the Debtor has no value as a going concern.  This statement alone does not begin to carry the Debtor's burden in proving that assertion. "[U]nder a plan granting an exclusive right, making no provision for competing bids or competing plans, a determination that the price was top dollar would necessarily be made by a judge in bankruptcy court, whereas the best way to determine value is exposure to a market." *LaSalle*, 526 U.S. at 457. Without the equity in the reorganized debtor being offered for purchase to potential buyers, any decision on this point without more evidence would be one made in a vacuum.

### 2.  Market Test Requirement

*LaSalle* holds that a "debtor's prebankruptcy equity holders may not, over the objection of creditors, contribute new capital and receive ownership in the debtor's reorganized entity unless the reorganized entity has been subjected to some sort of market valuation." *H.G. Roebuck & Son, Inc. v. Alter Commc'ns, Inc.*, No. BR 10-18241, 2011 WL 2261483, at *5 (D. Md. June 3, 2011). "[A] market test would require an opportunity to offer competing plans or would be satisfied by a right to bid for the same interest sought by old equity[.]" *In re Smithville Crossing, LLC*, No. 11-02573-8-JRL, 2012 WL 259947, at *1 (Bankr. E.D.N.C. January 27, 2012); *citing LaSalle*, 526 U.S. at 458. Furthermore, "[c]ompetition is essential whenever a plan of reorganization leaves an objecting creditor unpaid yet distributes an equity interest to an insider." *In re Castleton Plaza, LP*, 707 F.3d 821, 822 (7th Cir. 2013).

Competition between Mr. Sewell and a hypothetical potential buyer could increase the price paid for new equity in the reorganized debtor, thereby providing a larger return to the class of general unsecured creditors. A lack of competing bids would demonstrate that the subordination of Mr. Sewell's claims and the $100,000 cash infusion is reasonably equivalent to the value or interest received or retained. *See Bumgardner*, 2013 Bankr. LEXIS 747, at *29.

On the other hand, the market test can be waived, although generally this occurs after the plan exclusivity period has expired, and any party in interest could propose a competing plan but has not. *See, e.g., Bumgardner*, 2013 Bankr. LEXIS 747, at *29-30 (holding the new value exception was satisfied where no other party even attempted to outbid the prior equity holder or propose a competing plan when the case was months outside the exclusivity period). Similarly, if no other party is eligible to own the business, or if all eligible buyers *decline* to bid after given an opportunity, the requirement could be deemed met. Thus, evidence of futility could avoid the need for an extensive and concerted marketing effort.  However, in that event, further evidence of the actual value to be received by Class 12 in retaining all equity must be presented, along with a comparison of the relative return to Class 11. Other than an unsworn proffer made by the attorney for the franchisor, Golden Corral, to the effect it would veto replacement of Mr. Sewell as the owner (a position subject to possible challenge), the Debtor has presented no evidence of futility or absence of qualified bidders.

Mr. Sewell may be the best, or ultimately even the only, candidate available to guide a reorganized debtor into a successful and prosperous future. "Old equity may be in the best position to make a go of the reorganized enterprise and so may be the party most likely to work out an equity-for-value reorganization*." LaSalle*, 526 U.S. at 453. However, the Debtor has not presented enough evidence to support this supposition, nor has it produced any evidence of  the value of the

business as a going concern, how to measure the value of the surrendered Note 1 debt, or whether eligible third parties exist who might be interested in purchasing the business. Given this dearth of information, the Plan and Amended Plan cannot be approved.

### E.  Fair and Equitable Treatment

The Debtor's evidence projects an accumulation of $2.8 million in retained earnings in the company over the first five years following plan confirmation. Only Mr. Sewell would benefit if this projection is accurate, *plus* only he would benefit on the upside if the projection is exceeded. Under the Plan and Amended Plan, Class 11 unsecured creditors would receive no additional recovery in the event of a windfall for Class 12 resulting from better than expected earnings, or a greater return in the event of a highly profitable future sale. Taking these crystal ball projections into account, the court finds that the plan violates § 1123(a)(4) by paying what amounts to a small return on debt (less than 4% a year for five years under current projections) without any upside from profits or a future going concern sale of the business after improved performance. The court concludes that under the Plan as presently formulated, Mr. Sewell is receiving superior treatment under the Plan and Amended Plan, not equal or inferior treatment as required by § 1123(a)(4).

The court cannot speculate what would be an appropriate return to or formula for Class 11 to enable cramdown under § 1129(b). It is mindful of the caution against imposing a plan process based on pure "mathematical calculations." *In re Woodbrook Assocs.,* 16 F.3d 312, 315 (7th Cir.1994). Algebraic formulas can be manipulated. Instead, the contribution to the affected class must be real and substantial, but not so high and unrealistic as to leave a plan infeasible or the converting equity class with no incentive. *Id.* at 320. Further, what may be acceptable in a standard one common unsecured class might not be fair where all of the upside is destined for one creditor without adequate compensation to the remaining class members.

## CONCLUSION

The problems expressed require a reassessment by the Debtor and the Committee of what is fair and equitable under the circumstances. No business will survive, and no return to creditors will be paid, if the present approach of the parties prevails. The Debtor likely cannot survive another round of extraordinarily expensive administrative costs. Time is of the essence, and the Debtor is directed to file a second and comprehensive amended plan within twenty-one (21) days of the date of this opinion. A new confirmation hearing will then be set on short notice, the form of which (live or virtual) will turn on current conditions and agreement of the parties.

**END OF DOCUMENT**